**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CLEAN LABEL PROJECT FOUNDATION | : : : |
| Plaintiff, | : Case No. Case No. 20-cv-03229-RC : |
| v. | : Hon. Rudolph Contreras : |
| GARDEN OF LIFE, LLC, | : : |
| Defendant. | : : |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>

## TABLE OF CONTENTS

Page

INTRODUCTION....................................................................................................................1

BACKGROUND ...................................................................................................................3

ARGUMENT ........................................................................................................................8

I.      **Plaintiff Lacks Article III Standing Because It Has Not Alleged Injury-In-
        Fact.** ..................................................................................................................8

II.     **Enforcing the CPPA In the Manner Urged By Plaintiff Would Violate
        Defendant's First Amendment Right to Freedom of Speech.** .....................12

III.    **The Complaint Should Be Dismissed Under The Doctrine Of Primary
        Jurisdiction.** ..................................................................................................17

CONCLUSION .....................................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006)..................................................................................... 10

*Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n*,
965 F.2d 1118 (D.C. Cir. 1992)................................................................................... 21

*AT&T v. MCI Commc'ns Corp.*,
837 F. Supp. 13 (D.D.C. 1993).................................................................................... 21

*\*Barr v. Am. Ass'n of Political Consultants, Inc.*,
140 S. Ct. 2335 (2020) ...................................................................................... 2, 12, 13

*\*Beyond Pesticides v. Dr Pepper Snapple Grp., Inc.*,
No. CV 17-1431, 2019 WL 2744685 (D.D.C. July 1, 2019) .................................. 10, 11, 18

*\*Central Hudson Gas & Electric Corp. v. Public Service Commission*,
447 U.S. 557 (1980) ..........................................................................................*passim*

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...................................................................................................... 8

*D.C. v. ExxonMobil Oil Corp.*,
172 A.3d 412 (D.C. 2017) ........................................................................................... 11

*Educ. v. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005)..................................................................................... 9

*Env't Working Grp. v. U.S. Food & Drug Admin.*,
301 F. Supp. 3d 165 (D.D.C. 2018)............................................................................ 2, 9

*Frankeny v. Dist. Hosp. Partners, LP*,
225 A.3d 999 (D.C. 2020)........................................................................................... 14

*\*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) .......................................................................................... 2, 12, 14

*Grayson v. AT&T Corp.*,
15 A.3d 219 (D.C. 2011)............................................................................................. 11

*Hancock v. Urban Outfitters, Inc.*,
830 F.3d 511 (D.C. Cir. 2016)..................................................................................... 11

*\*Himmelman v. MCI Commc'ns Corp.*,
104 F. Supp. 2d 1 (D.D.C. 2000)................................................................................. 21

*Int'l Dairy Foods Ass'n v. Amestoy,
    92 F.3d 67 (2d Cir. 1996) ................................................................................ 16

*Int'l Outdoor, Inc. v. City of Troy, Michigan,
    974 F.3d 690 (6th Cir. 2020) ................................................................ 2, 12, 13

Life Advocates v. Becerra,
    138 S. Ct. 2361 (2018) ..................................................................................... 17

Lorillard Tobacco Co. v. Reilly,
    533 U.S. 525 (2001) ......................................................................................... 16

*Lujan v. Defs. of Wildlife,
    504 U.S. 555 (1992) ...................................................................................... 1, 8, 9

Marbury v. Madison,
    5 U.S. 137 (1803) ............................................................................................... 8

Monsanto Co. v. Geertson Seed Farms,
    561 U.S. 139 (2010) ............................................................................................ 8

Nat'l Ass'n of Mfrs. v. SEC,
    800 F.3d 518 (D.C. Cir. 2015) ......................................................................... 16

Nat'l Ass'n of Wheat Growers v. Zeise,
    309 F. Supp. 3d 842 (E.D. Cal. 2018) ............................................................. 16

Nat'l Taxpayers Union, Inc. v. United States,
    68 F.3d 1428 (D.C. Cir. 1995) ........................................................................... 9

*Nike, Inc. v. Kasky,
    539 U.S. 654 (2003) ................................................................................ 1, 2, 12, 14

Raines v. Byrd,
    521 U.S. 811 (1997) .......................................................................................... 11

Reed v. Town of Gilbert, Ariz.,
    576 U.S. 155 (2015) .......................................................................................... 14

Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,
    487 U.S. 781 (1988) ..................................................................................... 3, 17

Riverside Hosp. v. D.C. Dep't of Health,
    944 A.2d 1098 (D.C. 2008) .............................................................................. 11

Roberts v. U.S. Jaycees,
    468 U.S. 609 (1984) .......................................................................................... 12

Simon v. E. Ky. Welfare Rights Org.,
    426 U.S. 26 (1976) .............................................................................................. 8

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ................................................................................................ 12

*\*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) .......................................................................................... 1, 11

*\*Time, Inc. v. Hill*,
  385 U.S. 374 (1967) ........................................................................................ 2, 12, 14

*Total Telecomms. Servs., Inc. v. AT&T*,
  919 F. Supp. 472 (D.D.C. 1996), *aff'd*, 99 F.3d 448 (D.C. Cir. 1996)................................ 21

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015)....................................................................................... 9

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) (O'Connor, J. concurring)............................................................. 12

*United States v. Richardson*,
  418 U.S. 166 (1974) (Powell, J., concurring) ................................................................ 8

*\*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985) ................................................................................... 3, 13, 16, 17

## Statutes

21 U.S.C. §§ 346a(a)(1)(A) ............................................................................................ 7, 18

21 U.S.C. §§ 346a(a)(4) ............................................................................................... 7, 18

District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-
  3901 *et seq.*..................................................................................................... *passim*

D.C. Code § 28-3904 ................................................................................................. 4

D.C. Code § 28-3904(e) and (f) ................................................................................... 14

## Other Authorities

40 C.F.R. 180.1 *et seq.*............................................................................................... 7

40 C.F.R. § 180.408 .................................................................................................. 18

40 C.F.R. § 180.472 .................................................................................................. 18

40 C.F.R. § 180.495 .................................................................................................. 18

40 C.F.R. § 180.564 .................................................................................................. 18

40 C.F.R. § 180.566 .................................................................................................. 18

40 C.F.R. § 180.582 .................................................................................................. 18

40 C.F.R. § 180.678 ................................................................................................. 18

40 C.F.R. § 180.905 ................................................................................................. 18

40 C.F.R. § 578 ....................................................................................................... 18

U.S. Const. amend. I ........................................................................................... *passim*

U.S. Const. art. III, § 2 .............................................................................................. 8

Fed. R. Civ. P. 12(b)(1) ............................................................................................ 11

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 17, 22

## INTRODUCTION

Invoking the broadly worded D.C. Consumer Protection Procedures Act ("CPPA"), Plaintiff Clean Label Project Foundation challenges Defendant Garden of Life's general description of its business philosophy on the "about us" section of its website and seeks to compel Garden of Life to engage in advertising to correct whatever misimpression its generic statements may have left on consumers in the District of Columbia. Plaintiff's sole purported basis is that certain Garden of Life prenatal vitamin products ("Products") allegedly contain unspecified or trace amounts of well-studied, common contaminants. It is hard to imagine a more generalized grievance, a less narrowly tailored restriction on speech, or a more brazen request that this Court don the mantle of regulator. Because Plaintiff lacks Article III standing, seeks to infringe Garden of Life's right to free speech, and asks the Court to supplant the vast expertise of federal and state regulators, the Court should dismiss the Complaint.

Plaintiff lacks Article III standing because it does not allege it has been injured and therefore lacks the "irreducible constitutional minimum" of injury-in-fact. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Plaintiff instead is proceeding as a private attorney general seeking to enforce the CPPA on behalf of "the general public of the District of Columbia" (Compl. ¶¶ 45) and therefore lacks Article III standing. *Nike, Inc. v. Kasky*, 539 U.S. 654, 661 (2003) (Stevens, J., concurring). The Complaint does not allege that Plaintiff or any of its members saw or relied on any of the alleged misrepresentations or were injured by any failure to disclose. To the contrary, it alleges that Plaintiff purchased the Products for the purpose of testing them. Compl. ¶¶ 25, 42. Plaintiff does not allege any impediment to its mission, and its purported status as non-profit organization makes no difference because organizations seeking to establish Article III standing

must make the same showing as individuals.  *See Env't Working Grp. v. U.S. Food & Drug Admin.*, 301 F. Supp. 3d 165, 170 (D.D.C. 2018).

The way in which Plaintiff proposes to apply the CPPA would also violate Garden of Life's right to freedom of speech because the statements challenged—descriptions of the Defendant's business philosophy found on the "about us" section of its website—are expressive speech entitled to full First Amendment protection.  Not only that, the Complaint is concerned exclusively with the message conveyed by the challenged statements, meaning that the restrictions it seeks to impose are content-based and subject to strict scrutiny.  *See, e.g., Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020); *Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690 (6th Cir. 2020).  Plaintiff cannot avoid heightened scrutiny under the First Amendment by merely alleging that the statements are misleading.  In a case like this, with a non-injured Plaintiff purporting to act as a private attorney general, challenging non-commercial speech under the auspices of a strict liability statute, heightened scrutiny applies even where the speech is allegedly misleading.  *Nike,* 539 U.S. at 667 (Breyer, J., dissenting) (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340 (1974) and *Time, Inc. v. Hill,* 385 U.S. 374, 388-389 (1967) for the principle that "speech on matters of public concern requires 'breathing space' potentially incorporating certain false or misleading speech—in order to survive.").

Even if the challenged statements are treated as commercial speech and the proposed application of the CPPA to them is considered content-neutral, the Complaint still fails under *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 562 (1980), because there is no governmental interest in limiting exposure to common contaminants at levels lower than those identified by the FDA or EPA as having no safety risk.  *See infra*, Part III.  And

the corrective advertising Plaintiff seeks to compel likewise cannot meet the strict First Amendment standard of *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985). Furthermore, Plaintiff's failure to allege that there is a precise level for any of these substances at which disclosure is or is not necessary shows this litigation for what it is: an attempt to chill Garden of Life's speech. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 793-94 (1988) (declaring a vague "reasonableness" standard to be a "fundamental flaw" of a statute regulating speech).

But even if the Complaint could overcome these infirmities, at base the Plaintiff is asking the Court to function as a regulator, to set standards that federal and state regulators have not set and indeed have specifically declined to set. The Court should refuse this overture under the doctrine of primary jurisdiction. The FDA and EPA have extensively studied and established specific levels related to the presence of pesticide residues, metals, and bisphenol A (BPA). *See infra*, Part III. Plaintiff ignores this, and asks the Court to ignore it as well, and to hold that mere "detectable" or trace amounts of these substances in the Products render unlawful such generic statements as "say yes to clean." Compl. ¶ 89. To do so, the Court would need to make an independent, scientific determination regarding whether the presence and levels of the substances are a safety concern or render the challenged speech misleading. The considerations that animate the primary jurisdiction doctrine—judicial expertise, regulatory expertise, and the risk of inconsistent judgments—weigh strongly in favor of allowing the appropriate regulatory bodies to continue to do their work. The Court should dismiss the Complaint.

## BACKGROUND

Defendant Garden of Life LLC ("Garden of Life") is a recognized leader and innovator in whole food, science-based, USDA Certified Organic and Non-GMO Project Verified nutrition. The company sells more than 250 branded supplements that help people achieve health benefits.

Plaintiff Clean Label Project Foundation ("CLP") purports to a be a non-profit and public interest organization, describing its mission as "to bring truth and transparency to food and consumer products labeling."  Compl. ¶ 138.  It avers that it "caused the purchasing" of the Products, along with 200 other products, for purpose of having them tested.  *Id.* ¶¶ 25, 42.  Based on the results of this testing, the Complaint alleges that the Products are falsely advertised because they contain one or more of the following substances: lead, cadmium, mercury, BPA, and various pesticides.  *Id.* ¶¶ 100-11.  The Complaint identifies statements from the Garden of Life website that it alleges are inconsistent with the presence of these common contaminants (*id.* ¶¶ 88-94), asserts failure to disclose their presence (*id.* ¶ 32), and alleges that the Products are adulterated because they are unsafe.  *Id.* ¶ 23.  Plaintiff alleges that Garden of Life's conduct is an unlawful trade practice in violation of D.C. Code § 28-3904 and seeks an injunction to halt marketing and sales of the Products (*id.* ¶ 33) as well as corrective advertising, attorneys' fees, and punitive damages.  *Id.*, Prayer for Relief.

A closer look reveals that the Complaint bears none of the indicia of a well-pleaded complaint or the type of grievance that should be permitted to proceed in Court:

*No injury-in-fact*:  Plaintiff does not allege that it has been injured, or even that it suffered an injury attributable to Garden of Life's conduct.  It does not allege that it purchased the Products in reliance on the alleged misrepresentations or omissions.  Indeed, it alleges the opposite, that it purchased the Products for the purpose of having them tested.  *Id.* ¶¶ 25, 42.  It alleges generally that "Defendant has caused harm to the general public of the District of Columbia" and that "Garden of Life has failed to remedy the problem with the Products, causing ongoing harm to D.C. consumers" (*id.* ¶¶ 45, 118), but the nature of the harm referenced in these conclusory allegations is not explained.  No consumer is alleged to have incurred a physical

4

injury attributable to the challenged statements or the Products, and no one is alleged to have paid more for the Products than they would have absent the challenged statements on Garden of Life's website.

*No connection to the District of Columbia:*  There is no allegation that Plaintiff purchased the Products in the District of Columbia, that any consumer was injured in the District of Columbia, or that the alleged misrepresentations were targeted to or viewed by anyone in the District of Columbia.  The only connection to the District of Columbia is the statute invoked and the court in which the case was filed.  In other words, Plaintiff is forum shopping, and improperly attempting to use the "private attorney general" provision of the CPPA to avoid the standing requirements of Article III.

*No actionable misrepresentation identified.*  The Complaint does not identify any actionable misrepresentation, much less one that is *about the Products*.  It contains images of the labels of the Products but does not assert that any statements on the labels are misrepresentations. *Cf.* Compl. ¶ 8 (including images of product labels) *with id.* ¶¶ 89-96 (describing alleged misrepresentations but referencing no label statements or Products).  The statements the Complaint does allege are misleading are taken from the "about us" or similar sections of the Garden of Life website but are not connected to the Products.  *Id.* ¶ 88-92, 94.  The nature of these statements is generic and not subject to being disproved.  *See, e.g.*, *id.* ¶ 88 (statement "clean is healthy" and discussion of "the science of whole food" taken from "about us" webpage); *id.* ¶ 89 ("say YES to clean vitamins" taken from unspecified webpage); *id.* ¶ 90 (statement that Garden of Life is "uncompromising about your health" taken from "about us" webpage); *id.* ¶ 91 (statement that vitamins are "specifically formulated" taken from unspecified webpage); *id.* ¶ 92 (statement "What to Look For" from unspecified webpage); *id.* ¶ 94 (citing

same paragraph as identified by paragraph 90).[1]  There is no allegation that Plaintiff, any of its

members, or any consumer bought the Products from the webpages containing the challenged

statements, or that it is even possible to do so.  *Id.* ¶¶ 89-96.

*No legal or scientific standard or levels identified.*  The Complaint does not allege any

legal or scientific standard indicating the level at which the presence of any substances alleged to

be in the Products is unsafe, the level at which any such substance should be disclosed, or the

level at which the presence of any such substance renders otherwise neutral statements

misleading.  With respect to pesticides, it does not allege that any specific level of any pesticide

exists in any product, even though Plaintiff purportedly tested the products.  Compl. ¶¶ 25, 31,

87, 97, 111 (alleging only the presence of "detectable levels" of pesticides).  For metals and

BPA, the Complaint identifies the purported level of lead in several Products but compares that

level only to levels in other products tested by Plaintiff.  *Id.* ¶ 103c (asserting, for example, that

one Product has lead content that is "higher than 49.2% of prenatal vitamins tested, cadmium

that is higher than 50.2% of other prenatal products tested, and mercury content higher than

88.1% of other prenatal vitamins tested.)  These measurements and comparisons are meaningless

because: (1) there is no description of the set of products that Plaintiff tested or any allegation

that those products reflected all or most similar products on the market; (2) there is no rule or

legal standard that all products above some percentile in the universe of similar products are

susceptible to unlawful trade practices claims—after all, 50% of products will always be above

the median and 50% below; and (3) the Complaint identifies no objective regulatory or legal

criteria to which the levels can be compared.  Other than these allegations comparing Garden of

---

[1] As to the *only* statements identified that discuss an actual Product—those in paragraph 93 regarding Garden of Life's Oceans Mom Prenatal DHA Omega—the Complaint asserts that Garden of Life "adds specific focus to brain development, one of the areas most affected by heavy metal toxins such as lead." *Id.* ¶ 93.  However, the Complaint does *not* allege that the Oceans Mom Prenatal product contains lead.  *Id.* ¶¶ 100-103.  This allegation is immaterial.

Life's products to this unspecified set of other products, the Complaint cites *no law, regulation, or scientific standard* regarding the alleged levels of these substances in the products.

*No reference to regulatory standards and expertise.*  The Complaint ignores the fact that FDA and EPA have researched and issued standards regarding the presence and acceptable levels in the food supply for each of the substances in question.  For example, pesticide residues are permitted to be present in foods in specified trace amounts, known as tolerances, without the food being deemed unsafe or adulterated.  21 U.S.C. §§ 346a(a)(1)(A), 346a(a)(4).  The EPA sets the tolerances for pesticides and FDA sets and enforces them for products like those at issue in this case.  The tolerances, including those for the specific pesticides identified in the Complaint, are set out at 40 C.F.R. 180.1 *et seq*.  Notwithstanding this, the Complaint alleges that any "detectable level" of these pesticides renders the sale of the Products unlawful and the statements regarding them misleading under the CPPA.  The same or similar is true for BPA, lead, cadmium, and mercury.  *See* Part III, *infra*.

*Fourteen other lawsuits filed show the risk of inaction.*  If there were any doubt that Plaintiff is attempting to utilize the CPPA to achieve via litigation what it ought to pursue via the legislative and regulatory processes, it is dispelled by the fact that Plaintiff has filed *fourteen* other lawsuits against other defendants in the last six months, all in the District of Columbia, asserting similar allegations across a range of product categories.  *See* Def's. Request for Judicial Notice ("RJN") Exs. 1-14.  If this strategy is permitted to proceed beyond the pleading stage, the Court may find itself overrun by similar attempts from other self-described "public service organizations"[2] to legislate via litigation, unhindered by the requirement of injury-in-fact.  The

---

[2] Although this Court need not resolve the question on this motion, Plaintiff's status as a "public service organization" under the CPPA is at best questionable.  *See* RJN Ex. 15 (Complaint in *Pharmavite v. Clean Label Project Foundation et al.*, No. 2:20-cv-8001 (C.D. Cal) alleging that Clean Label Project Foundation is part of a "money-making 'protection racket'" in violation of RICO, the Lanham Act, and the Cal. Unfair Competition law.

specter of such litigation will exert a chilling effect that will lead companies to curtail their own speech, anathema to the First Amendment.  And, the Court will be asked to operate as a shadow regulatory agency, determining in litigation scientific, public health, and policy issues that are squarely within the purview of regulatory agencies.

## ARGUMENT

### I.     Plaintiff Lacks Article III Standing Because It Has Not Alleged Injury-In-Fact.

Article III of the Constitution limits federal courts' jurisdiction to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  The Supreme Court has stated that "[n]o principle is more fundamental to the judiciary's proper role in our system of government" and that "[t]he concept of standing is part of this limitation."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976) (citation omitted).  This is because the "province of the court . . . is, solely, to decide on the rights of individuals."  *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 576 (1992) (quoting *Marbury v. Madison*, 5 U.S. 137, 170 (1803)).  By contrast, "[v]indicating the *public* interest . . . is the function of Congress and the Chief Executive."  *Id*. (emphasis in original).  Dilution of standing requirements is "directly related to the expansion of judicial power" and risks usurping of "the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408-409 (2013) (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)).

To establish the existence of a "case or controversy," i.e., to show Article III standing, a plaintiff must therefore show that *it* has suffered an injury-in-fact, which is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (citations, footnotes and internal quotations marks omitted).  The injury cannot be speculative but must instead be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).  A plaintiff raising

only a "generally available grievance . . . seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74.

An organization seeking to establish Article III standing must make the same showing as an individual. *Env't Working Grp.*, 301 F. Supp. 3d at 170.[3]  To show an injury to its interest, an organization must show that the defendant's conduct "perceptibly impaired the organization's ability to provide services." *Id*. at 171 (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015).  "Perceptible impairment occurs when the challenged conduct causes an actual inhibition of daily operations." *Id*.  Expenditure of resources on advocacy is not a cognizable Article III injury.  *See Ctr. for Law + Educ. v. Dep't of Educ.,* 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005) ("[T]o hold that a lobbyist/advocacy group had standing to challenge government policy with no injury other than injury to its advocacy would eviscerate standing doctrine's actual injury requirement.").  Neither are expenditures spent on litigation.  *Nat'l Taxpayers Union, Inc. v. United States,* 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").

In this case, Plaintiff has not alleged that it suffered an injury-in-fact.  The Complaint does not allege that Plaintiff purchased the Products in reliance on the alleged misrepresentation or omission.  Indeed, it alleges the opposite:  that Plaintiff "caused the purchasing" of the Products (presumably by someone else, perhaps with someone else's money) for the purpose of having them tested.  Compl. ¶¶ 25, 42.  It likewise does not allege any "actual inhibition of [the organization's] daily operations" as is necessary to establish a "perceptible impairment" of

---

[3] An organization can also assert "associational standing" by alleging an injury to one of its members, but CLP does not allege it has any members much less that any member was injured.

Plaintiff's ability to provide services. Plaintiff avers that it was "founded with the purpose of advocating for and educating consumers, including consumers in the District of Columbia, in the arena of clean and healthy food and ecological systems" and that its mission is "to bring truth and transparency to food and consumer products labeling." *Id*. ¶ 138. There is simply no sense in which Garden of Life, by making generalized statements about its business philosophy on the "about us" section of its website (*id*. ¶¶ 88-96) has "perceptibly impaired" Plaintiff's ability to pursue its mission.

The recent decision of this Court in *Beyond Pesticides v. Dr Pepper Snapple Grp., Inc.*, No. CV 17-1431, 2019 WL 2744685 (D.D.C. July 1, 2019), is directly on point. In that case, as in this one, a non-profit plaintiff purported to bring suit on behalf of the general public under the CPPA, there alleging that Mott's applesauce was falsely advertised as "natural" because plaintiff's testing showed that it contained trace amounts of pesticides. *Id*. at *1. The Court dismissed the case for lack of Article III standing, reasoning that "interest groups cannot bring a generalized grievance on the public's behalf." *Id*. Unlike Plaintiff here, Beyond Pesticides argued that it had purchased the applesauce with its own funds, but the Court rejected this argument because Beyond Pesticides admitted that it purchased the products only to evaluate whether they were made of all natural ingredients and "this Circuit do[es] not recognize that 'self-inflicted harm' as injury in fact." *Id*. (quoting *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006)).

The *Beyond Pesticides* Court also rejected the argument that Section 28-3905(k) of the CPPA conferred standing on it as a nonprofit even without an injury, reasoning that "[plaintiff] lacks the 'irreducible constitutional minimum to sue in federal court' because 'Article III standing requires a concrete injury *even in the context of a statutory violation*.'" *Id*. at *2

(quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-49 (2016)) (emphasis added).  The Court noted that "[s]imply put, the D.C. Council's 'role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *Id.*

The same is true in this case.  Plaintiff alleges that the CPPA provides it with standing to sue on behalf of D.C. consumers, irrespective of whether it has incurred an injury.  Compl. ¶ 140 (asserting that Section 28-3905(k)(1)(D)(i) of the CPPA allows for non-profit organizational standing and public interest organizational standing to the fullest extent recognized by D.C. Court of Appeals).  But the Supreme Court has explained that a legislature "cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing" under Article III.  *Spokeo*, 136 S. Ct. at 1547-48 (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997)); *see also Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 514 (D.C. Cir. 2016) ("[T]he legislature cannot dispense with the constitutional baseline of a concrete injury in fact.") (citation omitted).

Plaintiff has not alleged injury-in-fact necessary for Article III standing.  Garden of Life respectfully requests that the case be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).[4]

---

[4] The absence of standing is not a basis for remand because D.C. courts apply Article III standing requirements commensurately with federal courts.  *See, e.g.*, *D.C. v. ExxonMobil Oil Corp.*, 172 A.3d 412, 419 (D.C. 2017) ("'[E]ven though Congress created the District of Columbia court system under Article I of the Constitution, rather than Article III, this court has followed consistently the constitutional standing requirement embodied in Article III.'") (quoting *Grayson v. AT&T Corp.*, 15 A.3d 219, 224 (D.C. 2011)); *Riverside Hosp. v. D.C. Dep't of Health*, 944 A.2d 1098, 1103–04 (D.C. 2008) ("Although Congress did not establish this court under Article III of the Constitution, we generally adhere to the case and controversy requirement of Article III as well as prudential principles of standing").

**II.     Enforcing the CPPA In the Manner Urged By Plaintiff Would Violate Defendant's First Amendment Right to Freedom of Speech.**

The First Amendment extends protection to speech regarding "a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  To justify abridging such speech, the proponent of the limitation must show that the law is narrowly tailored to achieve a compelling government interest, i.e., that the limitation satisfies strict scrutiny.  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 680 (1994) ("Content-based speech restrictions are generally unconstitutional unless they are narrowly tailored to a compelling state interest.") (O'Connor, J. concurring).  This applies equally to commercial speech that is content-based.  *See, e.g.*, *Barr v. Am. Ass'n. of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020); *Int'l Outdoor, Inc. v. City of Troy, Mich.*, 974 F.3d 690, 707-08 (6th Cir. 2020); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011).

The Supreme Court has also afforded protection to speech on matters of public concern, even encompassing potentially misleading speech, to provide the breathing space necessary for such speech to survive.  *See, e.g., Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) ("The First Amendment requires that we protect some falsehood in order to protect speech that matters."); *Time, Inc. v. Hill*, 385 U.S. 374, 387 (1967) ("Factual error [is] . . . insufficient for an award of damages for false statements" absent proof of "knowledge that the statements are false or in reckless disregard of the truth"); *see also Nike*, 539 U.S. at 667 (Breyer, J., dissenting) (noting that "heightened scrutiny" would apply to commercial speech with a public component where challenged by a "private attorney general" under a strict liability statute.").

Certain categories of speech are subject to lesser, but still substantial, constitutional protection.  Commercial speech, i.e.—non-misleading speech proposing a commercial transaction—is subject to intermediate scrutiny if the limitation is content-neutral, meaning that

limitations on it are constitutional only if it is affirmatively shown that (1) the asserted governmental interest is substantial, (2) the restriction directly and materially advances that interest, and (3) the restriction is narrowly tailored. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 562-64 (1980). The Supreme Court has also recognized a narrow exception to the rule that restrictions on commercial speech are subject to at least intermediate scrutiny where the government seeks to compel the disclosure of a warning or disclaimer that is (i) purely factual and uncontroversial, (ii) reasonably related to a substantial government interest, and (iii) neither unjustified nor unduly burdensome. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).

In this case, strict scrutiny applies. The statements Plaintiff challenges under the aegis of the CPPA are explanations of Garden of Life's corporate philosophy. They are made on the "about us" page of Garden of Life's website, a webpage that describes the "three principles that guide what we make and how we make it at Garden of Life," and that explains that Garden of Life's philosophy is to use whole food ingredients that are certified USDA Organic and Non-GMO Verified. Compl. ¶¶ 88. The statements do not reference any of the Products, and the Complaint does not allege that it is even possible to purchase the Products—or any products— from the webpages. The statements thus do not "propos[e] a commercial transaction," the *sine qua non* of commercial speech. *Central Hudson*, 447 U.S. at 562. As a result, Plaintiff's attempt to curtail Garden of Life's speech via the CPPA must satisfy strict scrutiny.

Even if the challenged statements are considered commercial speech, the restrictions Plaintiff seeks to impose are still subject to strict scrutiny because they are content-based. *See, e.g., Barr*, 140 S. Ct. at 2347 (holding debt-collection exception to prohibition on robocalls a content-based restriction that failed strict scrutiny); *Int'l Outdoor* 974 F.3d at 703 ("regulation of

13

commercial speech that is not content-neutral is still subject to strict scrutiny"); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (explaining that laws that "target speech based on its communicative content . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests"). Plaintiff challenges Garden of Life's explanation of its business philosophy, which is reflective of Garden of Life's ideological viewpoint, as inconsistent with the alleged presence of contaminants in the Products. That is a paradigmatic content-based limitation because Plaintiff is alleging that Garden of Life can only make statements on its website that *Plaintiff* believes are consistent with the alleged presence of contaminants in the products. Indeed, the content of the challenged statements is the *only* aspect of the speech that Plaintiff objects to. Strict scrutiny applies.

The challenged speech is also entitled to heightened protection because it involves an issue of public concern.[5] *Gertz,* 418 U.S. at 340; *Time,* 385 U.S. at 387. Such heightened protection is particularly warranted in this case because (1) the speech in question is not commercial, or at most is mixed speech that contains components of commercial and ideological speech; (2) Plaintiff alleges no injury on behalf of itself or any of its members, and instead purports to act as a "private attorney general." *See supra*, Part I; *see also* Compl. ¶ 46 (asserting that plaintiff is "acting on behalf of the general public as a private attorney pursuant to [the CPPA]"); and (3) the CPPA is a strict liability statute: no scienter is required to establish a claim for false advertising. *See Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999, 1005 (D.C. 2020) (noting that "intentionality is not required under D.C. Code § 28-3904(e) and (f)"). *Cf. Nike*, 539 U.S. at 667 (Breyer, J., dissenting) (identifying factors that support applying heightened scrutiny to allegedly false commercial speech, including the non-commercial nature of the speech, private

---

[5]  At least accordingly to Plaintiff, who alleges that general statements such as "say Yes to clean" convey that the product is free from pesticides, metals and BPA.  Compl. ¶ 88.

attorney general provision of statute, and strict liability standard).  Permitting the CPPA to be enforced in the manner sought by Plaintiff would cause an impermissible chilling effect on speech.  *Id*.

Plaintiff cannot meet these standards.  There is *no* governmental interest, much less a compelling one, in limiting exposure to contaminants to levels below those identified by the FDA or EPA as having no safety risk.  *See infra*, Part III.  If there were, the government agencies charged with protecting the public from these exact risks, which have studied these same issues extensively over the course of decades, would have issued regulations furthering that interest.  They have not done so.  *Id*.  Even assuming *arguendo* the existence of such an interest, the use of the CPPA urged by Plaintiff is not a narrowly tailored way to achieve that interest.  There is no indication, for example, that Plaintiff pursued any more direct method, such as a citizen petition to the FDA requesting that it require disclosure of the presence and levels of these substances in prenatal vitamins.  Plaintiff's approach is also both underinclusive in that it has only sued Garden of Life in this litigation, and overinclusive in that the allegations apply to a potentially unbounded set of speech regarding a potentially unlimited set of products.

The result is the same even if the Court determines that the challenged speech is commercial speech, *and* that Plaintiff's challenge to it is content-neutral, *and* not otherwise entitled to heightened protection, because the lawsuit fails under *Central Hudson*.  Again, there is no governmental interest—much less a substantial one—in limiting the speech of entities selling products that contain *any* residues of pesticides or trace elements of metals, without some allegation that a standard is exceeded.  Even if one accepts arguendo the existence of a "substantial governmental interest" in reducing exposure to these substances below the safety levels indicated by the relevant federal agencies, the limitation on speech proposed does not

directly advance that interest, for the reasons stated *supra*.  The *Central Hudson* test is "not satisfied by mere speculation or conjecture" but rather requires a showing that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree."  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001).  Moreover, an unbounded limitation on speech imposed by a non-injured entity, asserted under a strict liability statute, cannot be said to be "narrowly tailored."

Lastly, even if the Complaint were construed as seeking nothing more than the disclosure of information (presumably through some sort of unspecified "corrective advertising" sought by Plaintiff), it still violates the First Amendment because the compelled disclosures are (i) not purely factual and uncontroversial; (ii) not reasonably related to a substantial government interest, and (iii) unjustified and unduly burdensome.  *Zauderer*, 471 U.S. at 651.  The very premise of the Complaint—that companies selling products containing levels of substances that do not exceed any state or federal safety thresholds cannot make generalized statements like "say yes to clean" without violating the CPPA—is controversial, inasmuch as it reflects a different conclusion regarding the safety of such products than that reached by the responsible agencies.  Nor would the disclosure be "purely factual" because it would be understood to convey a message about safety.  *See Nat'l Ass'n of Wheat Growers v. Zeise*, 309 F. Supp. 3d 842, 852-53 (E.D. Cal. 2018) (considering state-mandated warning for glyphosate to be controversial in light of contrary scientific findings); *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (rejecting requirement that minerals be labeled "not conflict free" as "hardly 'factual and non-ideological,'" because it would "convey[] moral responsibility for the Congo war").

Such a compelled disclosure would also not be "reasonably related" to a substantial government interest for the reasons discussed above.  *Zauderer*, 471 U.S. at 651; *see also Int'l*

*Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 73 (2d Cir. 1996) (holding requirement that milk sellers disclose use of rBST hormone on labels unconstitutional under *Zauderer* because FDA had found no health or safety concerns associated with rBST and mere consumer interest was insufficient to justify requiring "the functional equivalent of a warning").  It would also be unjustified and unduly burdensome because the harm addressed is speculative and, under Plaintiff's theory, a similar lawsuit could be brought by any organization, with respect to the presence of any substance, on the strength of nothing more than bare allegations of materiality, which would render attempts at compliance impractical.  *See Nat'l Inst. of Family + Life Advocates v. Becerra*, 138 S. Ct. 2361, 2377 (2018) (A compelled disclosure must "remedy a harm that is 'potentially real not purely hypothetical'" and "extend 'no broader than reasonably necessary.'"); *Riley*, 487 U.S. at 793-94 (declaring a vague "reasonableness" standard to be a "fundamental flaw" of a statute regulating speech).

The proposed restriction thus fails under any potential categorization of the speech in question, and the Complaint should be dismissed under Rule 12(b)(6) for seeking to impose a restriction that would violate the First Amendment.

**III.    The Complaint Should Be Dismissed Under The Doctrine Of Primary Jurisdiction.**

The Complaint asks the Court to apply the CPPA to hold that broad statements such as "say yes to clean" are misleading because they are inconsistent with the presence of unspecified levels of pesticide residues in the Products, and the presence of lead, cadmium, mercury and BPA at levels that do not exceed any legal standard.  Compl. ¶¶ 89-96.  The Court cannot apply the CPPA in this manner without establishing the level of each substance that presents a safety risk or that renders generalized statements by Garden of Life false and misleading.  That work has already been done, and continues to be done, by the FDA and EPA, and accordingly the

Court should defer to those agencies' ongoing consideration of these issues under the doctrine of primary jurisdiction.

*Pesticides***:**  The broad area of pesticide residues in food is jointly regulated by FDA, EPA, and USDA.  Under this regulatory scheme, pesticide residues can be present in foods in specified trace amounts, known as tolerances, without the food being deemed unsafe or adulterated.  *See* 21 U.S.C. §§ 346a(a)(1)(A), 346a(a)(4).  EPA sets the tolerances; USDA enforces them for meat, poultry and some egg products; and FDA enforces them for other products, such as those at issue in this case.  Specific tolerances have been established for the pesticides referenced in the Complaint, including Spinosyn A (40 C.F.R. § 180.495), Imidacloprid (40 C.F.R. § 180.472), Metalaxyl (40 C.F.R. § 180.408), Tricyclazole (40 C.F.R. § 180.678), Fenpyroximate (40 C.F.R. § 180.566), Indoxacarb (40 C.F.R. § 180.564), Pyraclostrobin (40 C.F.R. § 180.582), Acetamaprid (40 C.F.R. § 578); Rotenone (40 C.F.R. § 180.905).  One of the stated objectives of FDA's Total Diet Study, discussed *infra*, is to "determine concentrations of pesticide residues and industrial chemicals in selected TDS foods.").  RJN Ex. 16.

The Complaint alleges nothing more than the *presence* of some level of these pesticides in some of the Products.  Compl. ¶¶ 25, 31, 87, 97, 111 (asserting "detectable levels" of pesticides). It makes no reference to the *levels* of the pesticides, and no reference to the tolerances for such pesticides in the foregoing regulations.  By referring only to the *presence* of pesticides, and specifying no *levels,* Plaintiff asks the Court to interpret the CPPA as establishing a permissible level of *zero* for pesticides in prenatal vitamins, a step that is squarely within the remit of the EPA and FDA, as described above, and that involves complex scientific analysis that agencies—and not courts—are well suited to conduct.

*Lead and Cadmium*:  For almost 30 years, FDA has monitored the presence of trace amounts of metals, including lead and cadmium, in the food supply, through its annual Total Diet Study.  RJN Ex. 17.  The Total Diet Study has confirmed that both lead and cadmium are present in hundreds of foods.  *Id*. Ex. 18.  FDA has responded to this reality by conducting extensive testing to determine whether and at what levels the presence of lead and other metals poses a safety risk.  Among other efforts, it has established an Interim Reference Level (IRL) for lead intake, including for children and women of childbearing age.  This level is set at an order of magnitude (10 times) lower than the lowest blood lead level shown to potentially be harmful, and is 3 micrograms per day (for children) and 12.5 micrograms per day for women of child-bearing age.  *Id*. Ex. 19.  Not only that, FDA has extensively studied the precise issue in this case—the presence of lead in prenatal vitamins.  In 2008, FDA sampled 324 multivitamin-mineral products, including some prenatal products, calculated the median and maximum lead exposure levels and compared those levels to its tolerable daily intake levels.  *Id.* Ex. 20.  Thereafter, it did not issue regulations limiting statements that could be made regarding prenatal vitamins and supplements, much less requiring warnings or disclosures.

The Complaint makes no reference to this regulatory scheme, and no attempt to compare the alleged levels of lead in the Products to the FDA's IRL for lead or the lead levels in the 2008 study.  It asks the Court to consider this complex scientific topic anew, even though FDA is far better situated to do so, and indeed, has done so before.

*Mercury*:  EPA has established a reference dose ("RFd") for daily consumption of mercury, at 1 part per billion per kilogram of body weight per day.  Ex. 21.  Building off of the RFd, FDA has issued detailed guidelines for women who are or might become pregnant regarding consumption of seafood containing mercury.  *Id.;* Ex. 22.  These guidelines describe seafood

containing 15 parts per *million* of mercury as "Best Choice" that can be consumed up to three times per week. *Id.* By contrast, the Complaint in this case, which makes no reference to these EPA or FDA standards and guidelines, alleges the presence of mercury at levels of 23 parts per *billion* or lower. Compl. ¶ 103a(iii), b(ii), c(iii). These alleged levels are an order of magnitude lower than the level FDA has approved for consumption by pregnant women, which itself is an order of magnitude lower than the level EPA has identified as potentially harmful. Ex. 21 ("The [reference dose] includes a 10-fold uncertainty factor to allow for variability among individuals and groups.")

**BPA**: FDA has studied BPA extensively, and for decades it has been approved as safe for use in food contact materials. FDA reaffirmed this finding in 2008 and again in 2014 after extensive study. RJN Ex. 23. The FDA maintains a Frequently Asked Questions page regarding BPA that responds to the question "is BPA safe?" by stating "Yes" and explaining that "[s]tudies pursued by FDA's National Center for Toxicological Research (NCTR) have shown no effects of BPA from low-dose exposure." RJN Ex. 24. The 2014 study noted that "[n]o new information was identified to suggest revision of the existing safety assessment level . . . ." Ex. 25; see also Ex. 24 ("Studies pursued by FDA's National Center for Toxicological Research (NCTR) have shown no effects of BPA from low-dose exposure."). Again, the Complaint makes no reference to these regulatory standards and conclusions, and provides no explanation for why amounts far below approved intake levels are problematic, or why the Court should not be assuaged by FDA's finding that there are "no effects of BPA from low-dose exposure." Instead, Plaintiff asks the Court to find that the alleged presence of 88 parts per *billion* of BPA in one of the Products (Compl. ¶ 107a(i)) renders a broad statement on the company website misleading, under the auspices of a generalized statute governing unlawful practices.

Against this backdrop, the Court should dismiss the case under the doctrine of primary jurisdiction.  The doctrine is "premised on a desire for uniform outcomes and on the inherent advantage in allowing an agency . . . to apply its expert judgment to the issues in dispute."  *Total Telecomms. Servs., Inc. v. AT&T*, 919 F. Supp. 472, 478 (D.D.C. 1996), *aff'd*, 99 F.3d 448 (D.C. Cir. 1996); *see also, e.g., Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n*, 965 F.2d 1118, 1120 (D.C. Cir. 1992).  Courts consider four factors in determining whether to abstain under the doctrine of primary jurisdiction: (1) whether the question at issue is within the conventional expertise of judges; (2) whether the question at issue lies particularly within the agency's discretion or requires the exercise of agency expertise; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.  *See Himmelman v. MCI Commc'ns Corp.*, 104 F. Supp. 2d 1, 4 (D.D.C. 2000); *Total Telecomms. Servs.*, 919 F. Supp. at 478; *AT&T v. MCI Commc'ns Corp.*, 837 F. Supp. 13, 16 (D.D.C. 1993).

In this case, these factors weigh strongly in favor of abstention.  With respect to the first two factors, the issue of whether and at what level the presence of pesticides, metals, and BPA render statements false and misleading is inextricably bound to the question of the levels at which the presence of those substances are unsafe for consumers.  That question is squarely within the expertise of the regulatory agencies, which are aware of and currently regulate the presence and levels of these substances in food products, as discussed *supra*.

The third factor—the danger of inconsistent rulings—also weighs heavily in favor of abstention.  Plaintiff has not anchored the allegations in the Complaint to any legal, regulatory, or scientific standards, meaning that two courts could reach differing conclusions regarding the same level of a given substance in a Product.  This is not a hypothetical concern.  Plaintiff has

21

sued *fourteen* separate companies in the past six months, including multiple sellers of prenatal vitamins, meaning that this Court's determination, if it makes one, could be different from that of another court deciding the same issues.

Finally, no prior application has been made to the agencies with jurisdiction. This too supports abstention. If Plaintiff wishes to influence the levels of pesticides, heavy metals, and BPA in prenatal vitamins, it should petition the FDA to investigate and/or issue regulations on the topic. This would be a far superior approach to filing scattershot lawsuits and would lead to a uniform result that is based on the consideration of the relevant science by experts entrusted by Congress to make such important scientific and policy decisions. It would also relieve this Court from having to serve in the role of regulator, as Plaintiff requests. Accordingly, the Court should find that the doctrine of primary jurisdiction requires deference to the FDA and EPA in these circumstances, and should dismiss this case pursuant to Rule 12(b)(6).

## CONCLUSION

For the foregoing reasons, permitting this case to proceed would violate the U.S. Constitution's fundamental limitations on cases and controversies, on restrictions for free speech, and on the role of the courts in addressing scientific issues entrusted to expert regulatory agencies. Defendant Garden of Life respectfully requests that the Court dismiss the Complaint.

Dated: November 30, 2020              Respectfully submitted,

*/s/John Cella*_____
Robert N. Weiner (DC Bar No. 298133)
John Cella (DC Bar No. 1035356)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington D.C. 20001-3743
(202) 942-5000
Fax: (202) 942-5999
Robert.Weiner@arnoldporter.com

John.Cella@arnoldporter.com

Trenton H. Norris (D.C. Bar No. 442081)
(application for admission forthcoming)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
(415) 471-3100
Fax: (415) 471-3400
Trent.Norris@arnoldporter.com

Lori B. Leskin (*pro hac vice* pending)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
Fax: (212) 836-8689
Lori.Leskin@arnoldporter.com

*Counsel for Defendant Garden of Life, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of November, 2020, true copies of the foregoing were served via U.S. Mail on the following:

Travis Pittman
Holmes Pittman Haraguchi, LLP
P.O. Box 380
Chester, MD 21619
jtpittman@hphattorneys.com

Kristen M. Ross
Davitt, Lalley, Dey & McHale, PC
1971 Beltine Ave., Suite 106
Grand Rapids, MI 49525
kristen.ross@dldmlaw.com

*/s/  John Cella*
John Cella (DC Bar No. 1035356)

24