# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

CLEAN LABEL PROJECT FOUNDATION,

                            Plaintiff,

        v.                                          Case No. <u>1:20-cv-03229-RC</u>

GARDEN OF LIFE, LLC,                                Hon. Rudolph Contreras

                            Defendant.

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

COMES NOW, Plaintiff, Clean Label Project Foundation ("Plaintiff" or "CLP") and respectfully requests this Court deny Defendant's Motion to Dismiss, and states as follows:

## I.    INTRODUCTION

This Court has subject matter jurisdiction over this matter. Plaintiff is a non-profit as well as a public interest organization who has well-founded statutory standing under §28-390(k)(1)(D) or § 28-3901(k)(1)(C) of the D.C. CPPA. Plaintiff also has established Article III standing to bring this claim in the D.C Superior Court. Plaintiff alleges multiple violations of a D.C. consumer protection statute, directly affecting the consumer of the District. Plaintiff alleges a current, ongoing violation, not a mere speculative past due tangential issue as Defendant's caselaw references. In doing so, Plaintiff has met all of the elements for organizational standing; both those established by D.C. CPPA, as well as those established by Article III.

Secondarily, the speech at issue is content neutral and commercial speech and does not violate Defendant's First Amendment right to freedom of speech. Moreover, Defendant is not arguing that the D.C. CPPA, the law in question, is violating Defendant's First Amendment rights. Rather, Defendant is arguing that Plaintiff is misapplying a valid statute. Thus, the only question to be answered is whether Plaintiff has met the elements of the D.C. CPPA, which it has.

Finally, Federal law does not preempt this claim. The doctrine of primary jurisdiction does not apply to this matter. Plaintiff is asking the Court to examine Defendant's false and misleading sale and marketing of the Products under the D.C. CPPA, not to apply, alter, amend or change any federal regulation with regard to contaminants.

## II.  BACKGROUND

CLP has brough suit on behalf of the general public and the class of interested consumers against Garden of Life LLC, alleging the sale of their Garden of Life Vitamin Code Raw Prenatal (180ct), Garden of Life MyKind Organics Prenatal Multi-Certified Organic Whole Food (90ct), Garden of Life Dr. Formulated Probiotics-Once Daily Prenatal (30ct), Garden of Life Oceans Mom Prenatal DHA (30ct), Garden of Life MyKind Organics Prenatal Once Daily (30ct), Garden of Life MyKind Organics Prenatal Once Daily (90ct), Garden of Life MyKind Organics Prenatal (30ct), ("Products"), constituted unlawful trade practices under the D.C. CPPA. Specifically, CLP alleges that the packaging, marketing, and sale of the Products misled the public in the District of Columbia into believing that the product was free of contaminants not listed or represented as well as superior to other competitive prenatal vitamins. CLP alleges that the Product contained quantifiable levels of lead, cadmium, mercury, BPA and pesticides. CLP is a non-profit public interest organization, and the sole plaintiff in this action.

Defendant filed a Motion to Dismiss CLP's claims, based on the incorrect arguments that CLP lacked standing to bring its claims because it had suffered no injury-in-fact, no injury to the residents of the District of Columbia and therefore conferred no subject matter jurisdiction to this Court. Defendant further argues that enforcing the CPPA in the manner "[u]rged by Plaintiff" would violate Defendant's First Amendment Right to Freedom of Speech. Lastly, Defendant argues the Complaint should be dismissed under the Doctrine of Primacy Jurisdiction, as Defendant incorrectly argues Plaintiff's claims are preempted by Federal Law.

## III.  ARGUMENT

### A.  The Statutory History of the D.C. CPPA Affords Plaintiff Statutory Standing.

Defendant's arguments surrounding lack of standing fails to recognize the important and obvious changes to the D.C. CPPA's organization standing provisions as considered in conjunction with traditional notions of Article III standing. While Plaintiff agrees "vindicating the public interest…is a function of Congress and the Chief Executive;" false and misleading claims are regulated, in the context of this matter, by the D.C. CPPA and enforced by the Court.[1]  In examining Article III standing, Plaintiff agrees that it must show that is has suffered an injury-in-fact; however, it is equally important in the context of injury-in-fact analysis to examine that standard in conjunction with the organizational standing provisions outlined in the D.C. CPPA. Most notably, in April of 2013, there was an extensive overhaul of the CPPA's organizational standing provisions by amendment effective April 23, 2013.  Since the 2013 amendments to the CPPA took effect, courts have freely found standing for organizational plaintiffs.[2]

---

[1] *See* Defendant's Motion to Dismiss, I., *Citing Lujan v. Defs. Of Wildlife,* 504 U.S. 555, 567 (1992) (quoting *Marbury v. Madison, 5 U.S. 137, 170 (1803)).*

[2] *See Organic Consumers Ass'n v. General Mills, Inc.,* No. 2016 CA 6309 B, 2017 D.C. Super LEXIS 4 (July 6, 2017); *National Consumers League v. Gerber Prods. Co.,* No. 2014 CA 008202 B, 2015 D.C. Super. LEXIS 10 (August 5, 2015).

As pointed out by Defendant, *Grayson v. AT & T Corp.*, 15 A.3d 219 (D.C. 2011), outlines the Court of Appeals ruling that the CPPA retains an injury-in-fact standing requirement.[3] However, read in conjunction with the amendments to the D.C. CPPA, namely, subsequent Bill 19-581, which overhauled many of the provisions of the D.C. CPPA, it is clear that non-profit organizations as well as, and in addition to, public interest organizations may act as private attorneys general for the public under circumstances to ensure the organization has a sufficient state of its own to pursue the case with appropriate zeal.[4] Those important clarifications provide the court with a variety of ways to consider standing options that satisfy the prudential standing principles for non-profit and public interest organizations acting as private attorneys general, while encouraging the courts to be receptive to other approaches that rely on different means of ensuring a sufficient stake in the outcomes of the case.

## B. Non-profit Entities Have Constitutional Standing To Bring an Action For Misleading the Public.

Given the above, in 2014, the court issued a written opinion in *National Consumers League v. Bimbo Bakeries United States*, Case No. 2013 CA 006548 B, in which it confirmed not only can a non-profit entity pursue claims arising under the District of Columbia's Consumer Protection Procedures Act ("D.C. CPPA"), but more importantly, clarified that a non-profit entity had constitutional and statutory standing to bring an action against a commercial bakery for allegedly misleading the public with certain product labeling. Most on point, *Bimbo Bakery* held specifically that a non-profit had standing under both Article III of the Constitution and the D.C. CPPA.[5]

---

[3] What is noteworthy is that *Grayson* does not hold that Article III prohibits standing sought by suits filed under the D.C. CPPA

[4] Committee on Public Services and Consumer Affairs Memorandum on Bill 19-0581 (hereinafter the "Alexander Report," November 18, 2012) at 2).

[5] *Id.*

*Bimbo Bakery* further held that, although the D.C. CPPA did not excuse the need to prove constitutional standing, the statute did create certain rights, the impairment of which could constitute an injury-in-fact. Specifically, in accordance with the prior additions to the D.C. CPPA, the Court held that the D.C. CPPA conferred standing on a non-profit as a "private attorney general," as well as a non-profit public interest organization specifically permitted to bring an action seeking relief on behalf of a consumer or class of consumers. D.C. Code § 28-3905(k)(1)(D).

### C. Caselaw Cited by Defendant In Support of Their Position That CLP Lacks Article III Standing Can Be Distinguished From This Matter.

Defendant alleges that organizations seeking to establish Article III standing must make the same showing as an individual, citing *Env't Working Grp.,* 301 F. Supp 3d 165 (2018). Defendant's cite to *Env't Working Group,* to suggest that an injury to interest must show that the defendant's conduct "perceptibly impaired the organization's ability to provide services." *Env't Working Grp* at 170. However, in *Env't Working Group,* two advocacy organizations failed to satisfy the requirements for organizational standing because the allegations were of past injury, rather than real and immediate injury. The operative question in *Env't Working Group* was a two-part inquiry. First whether the agency's action or omission to act injured the organizations interest and, second, whether the organization used its resources to counteract that harm.[6]

Again, Plaintiff is a non-profit 501(C)(3) non-profit, as well as a public interest organization with a mission to promote and educate consumers with regard to food labeling truth and transparency, allowing them to make data-based educated decisions. Given that mission, and specifically interested in the market surrounding the labeling of prenatal vitamins, Plaintiff caused the purchase of Defendant's products to investigate the category of prenatal vitamins and test the

---

[6] *Id.*

purity of prenatal vitamins.[7]  The testing results indicate that Defendant's prenatal Products contain toxic contaminants, including lead, cadmium, mercury, BPA and pesticides.  All contaminates known to potentially cause serious and severe reproductive harm; all contaminants not found or referenced in any labeling or marketing on the part of the Defendant.

Further, testing also reveals that these contamination issues are not ubiquitous to the prenatal vitamin category, reflecting unique deficiencies on behalf of this Defendant.[8] Defendant's omissions and non-transparent labeling as well as their misleading marketing injured CLP's interest, as that interest is directly related to the investigation into, testing, and education of, truth and transparency of the Defendant's prenatal Products.  Secondarily, as noted in the Complaint, CLP educates consumers by using un-biased science in a straightforward medium, allowing consumers to make data-based decisions.[9]  The omissions of labeling and misleading marketing demonstrated by Garden of Life impedes the ability of D.C. consumers to make such educated data-based decisions, with regard to the purchase of Defendant's Products as well as the option to purchase Defendant's Products over its competitors; and therefore further harms the mission of CLP.

Defendant relies on *Ctr. for Law + Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005) ("[T]o hold that a lobbyist/advocacy group had standing to challenge government policy with no injury other than injury to its advocacy would eviscerate standing doctrine's actual injury requirement.")[10]  However, *Ctr. For Law + Educ.,* addresses the completely abstract procedural rights affecting standing.  In *Ctr. For Law + Educ.,* the No Child Left Behind Act required the

---

[7] Complaint at ¶25.  Additionally, Defendant's speculate regarding the phrase "caused the purchase."  To be clear, Plaintiff requested and authorized the purchase of the Products.  *See* Defendant's Motion to Dismiss p. 9
[8] Complaint at ¶29.
[9] Complaint at ¶41
[10] Defendant Motion to Dismiss at p. 9

Secretary to "[s]elect individuals to participate in such process from among individuals or groups that provided advice and recommendations, including representation from all geographic regions of the United States, in such numbers as will provide an equitable balance between representatives of parents and students and representatives of educators and educational officials.[11] What is noteworthy is that the No Child Left Behind Act is void of any reference to organizational interests. Thus, the concern of the organization was procedurally abstract. Any frustration would be attributed to the parents or the child, not the organizations advocacy or mission.

Unlike *Ctr. For Law + Educ.*, in the current matter, the D.C. CPPA's organizational standing provisions go to the very heart of CLP's concerns, specifically outlining the ability of a non-profit public interest organization to acquire standing. In this matter CLP's interests are concrete and clearly in line with those laid out by the D.C. CPPA. Further there is a causal relationship between the D.C. CPPA and the injury to CLP, as CLP has demonstrated an increased risk to the consumers of the District of Columbia, the frustration of which is a developed concern, given CLP's mission.

Defendant also cites *Beyond Pesticides v. Dr. Pepper Snapple Grp., Inc.,* No. CV 17-1431, 2019 WL 2744685 (D.D.C. July 1, 2019). This case is clearly distinguishable from *Beyond Pesticides* as in that matter the Plaintiff's allegations were based on one result of trace pesticide residue in one single Motts Applesauce Product. In the current matter, Plaintiff purchased over 200 products for individual and comparative testing. Plaintiff tested seven (7) products marketed by Defendant. Those results did not simply yield a trace amount of pesticide residue, which could tangentially be related to D.C. consumers; the testing results showed detectable amounts of lead, cadmium, mercury, BPA as well as multiple detectable pesticides, the amounts of which, on a per-

---

[11] *Id.* at 1

serving basis, can be as high as 96% worse than competitors in the category.[12]  Thus the contamination of seven (7) prenatal products marketed by Defendant, is not only imminently harmful to consumers, but further acts to perceptibly and actually impaired CLP in its mission to provide and educate as to food labeling truth and transparency regarding the marketed Products.

   **D.  Defendant has Misrepresented Prenatal Products To a Market of Already Vulnerable Individuals in The District of Columbia.**

   Additionally, Defendant does not market these Products as the general vague catch-all "all-natural" as in the Motts products cited to by Defendants in *Beyond Pesticides*.  Defendant markets these Products, along with their other products, as "clean nourishment for you and your baby." Specifically, nourishment that contains dangerous neurotoxic heavy metal contaminants. Defendant's advertise to D.C. consumers, that "Clean is Healthy" and encourages consumers to "Say Yes to Clean Vitamins", directly enticing, encouraging, and targeting D.C. consumers to not only purchase the products but purchase them over Defendant's competitors' products because of their "clean" "healthful" benefits.[13]  Defendant goes further and directly advises consumers what to look for in prenatal vitamins.  Defendant's website attempts educate on "The Science of Whole Food," explaining how the body was made to process foods and which foods have the ability to "impact and empower extraordinary health."[14] Specifically, Defendant focuses then on what goes in their Products, juxtaposing that with the promise to also "pay very close attention to what they keep out."[15] Thus, Defendant makes direct and pointed mis-assurances on its website regarding the impact of health and what is in and not in their Products, damaging the exact aim and mission of CLP's work.

---

[12] Plaintiff's Complaint ¶104(a) *et seq.*
[13] Plaintiff's Complaint ¶89-100
[14] Notably, Defendant's attempts to educate the D.C. Consumer regarding the Products is in direct contradiction to CLP's mission to educate consumers, as Defendant's marketing is false and misleading given Plaintiff's test results.
[15] Plaintiff's Complaint ¶89

Defendant additionally focuses marketing on brain development, one of the areas most affected by heavy metal toxins; toxins which CLP has created an undertaking around proper labeling and safety education. This is not just a generalized grievance on behalf of the general public; this is a Defendant who has misrepresented one of the most crucial prenatal items to a market of already at-risk individuals in the District of Columbia. A market that CLP, a non-profit *and* public interest organization, has a long-standing focus and mission to serve, educate, and protect, and a market that is being directly and harmfully impacted by Garden of Life's misrepresentations.

Thus, *Beyond Pesticides,* a non-profit corporation, that relied on only D.C. Code §28-3905(k)(1)(C), to provide standing through the "general public" for a violation involving one single consumer product with a trace amount of a pesticide is incredibly different from the case at bar. Additionally, Plaintiff here not only has Article III standing and statutory standing under 28-3905(k)(1)(C), but also has standing under § 28-3901(k)(1)(D).

**E. Plaintiff Here Possesses Standing Under Either of The Two Amendments § 28-390(K)(1)(D) or The More Limited § 28-3901(k)(1)(C).**

**a. § 28-3901(k)(1)(D)**

D.C. Code § (k)(1)(D) allows a public interest organization to bring any action that a consumer could bring under (k)(1)(A), so long as the organization has a sufficient nexus to the consumer's interests to represent those interests adequately:

> (i) Subject to sub-subparagraph (ii) of this subtitle, a public interest organization may, on behalf of the interests of a consumer or class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice.
> (ii) An action brought under sub-subparagraph (i) of this subparagraph shall be dismissed if the court determines that the public interest organization does not

have sufficient nexus to the interests involved of the consumer or class to adequately represent those interests.

Accordingly, (k)(1)(D) allows public-interest organizations, like CLP, with a nexus to consumer interests to bring an action for relief when untruth enters the marketplace to consumer detriment, regardless of whether the organization itself suffers the informational injury, or would have standing under federal precedent. Thus, (k)(1)(D) is intended to, and does, recognize organization standing beyond prior reliance on federal Article III cases.

It follows that, if Garden of Life has caused misrepresentations or omissions of material fact to enter the D.C. marketplace, the only question relevant to standing under D.C. Code 28-3901(k)(1)(D) is whether Plaintiff is a public-interest organization as defined in D.C. Code 28-3901(a)(15), and whether Plaintiff "ha[s] sufficient nexus to the interests involved of the consumer or class to adequately represent those interests."

Pursuant to D.C. Code 28-3901(a)(15), a public-interest organization is a "nonprofit organization that is organized and operating, in whole or in part, for the purpose of promoting interests or rights of consumers." As outlined in the Complaint, CLP is both a non-profit and public interest organization with a defined mission to enable consumers to make informed shopping choices based on food labeling truth and transparency.

A public-interest organizational Plaintiff, such as CLP, has "sufficient nexus to the interests involved of the consumer or class to adequately represent those interests." D.C. Code 28-3905(k)(1)(D)(ii). Plaintiff, CLP, was founded with the mission of reducing contamination in consumer products and aims to educate consumers on how to make informed choices.

Given the above, so long as the Complaint sufficiently alleges deception in the D.C. marketplace, the requirements of 28-3905(k)(1)(D) standing are met. As stated in Plaintiff's Complaint, Defendant's adulterated Product is exposing mothers and their babies to contaminants,

to include lead and cadmium, compounds known to cause reproductive harm in fetuses and infants. The negative effects of contaminants in prenatal vitamins has a direct impact on the D.C. consumer. As a result, D.C. consumers bear the risk of purchasing a product that contains toxic heavy metals, which are extremely dangerous to the fetus.

Additionally, and consistent with the ruling in *Grayson,* the mislabeling of the Products and the void of any mention of the contaminants and/or neurotoxins therein, is the causal connection between the damage done during the prenatal development process and the conduct alleged in CLP's Complaint. Secondarily, Garden of Life produces Products that are sold to Consumers through retail stores (to include within the District of Columbia), and online - the presence of these contaminants directly affects the consumer, the general public, of the District of Columbia. D.C. consumers are enticed to purchase these Products over the products of Garden of Life 's competitors based on these label claims. The potentially harmful label claims go directly to the core of CLP's mission, which is food labeling truth and transparency. This ambiguity in labeling and correlating contamination is directly harmful to the D.C. consumer and to the class of consumers for which CLP brings suit.

Accordingly, Plaintiffs have adequately alleged that they are in the class of plaintiffs who have a statutory right to bring CPPA action. Thus, the deprivation of that right constitutes an injury in fact that is sufficient to establish standing, even, arguendo, if the Court would find Plaintiff has not suffered a judicially cognizable injury in the absence of the statute.

### b. Plaintiffs Have Statutory Standing Pursuant to 28-3905(k)(1)(C)

CLP also has standing under the comparably narrower provisions of D.C. Code 28-3905(k)(1)(C) which provides:

> A nonprofit organization may, on behalf of itself of any of its members, or on any
> such behalf and on behalf of the general public, bring an action seeking relief from

the use of a trade practice in violation of a law of the District, including a violation involving consumer goods or services that the organization purchased or received in order to test or evaluate qualities pertaining to use for personal, household or family purposes.

Subsection (k)(1)(C) makes two important clarifications. First, (k)(1)(C) overrides precedent that would otherwise preclude "manufactured standing" from constituting injury-in-fact. New subsection (k)(1)(B) provides a right of action for consumers who act as product or service testers. Such consumers need not actually have been misled by a misrepresentation regarding a consumer good or service to have suffered an injury in fact giving rise to an actionable claim.

Second, as to the other forms of organization standing (K)(1)(C) directs courts to err on the widest side of the D.C. decisions interpreting organizational standing, even as they may change in the future. CLP bring this suit on behalf of both its members and the general public, possess "tester" standing under 29-3905(k)(1)(C) because CLP "purchased the products for the purposes of testing for purity"

Given the above, CLP has demonstrated an injury-in-fact sufficient to confer standing under both Article III and the D.C. CPPA.

## IV. ENFORCING THE D.C. CPPA DOES NOT VIOLATE DEFENDANT'S FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH

### A. Content-Based Speech Restrictions Are Not at Issue in This Matter.

Plaintiff agrees with Defendant that "[t]he First Amendment extends protection to speech regarding "a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). However, Defendant's statement that "[t]o justify abridging such speech, the proponent of the limitation must show that the law is narrowly tailored to achieve a compelling government interest, i.e., that the limitation satisfies strict scrutiny" is misguided given that such a level of scrutiny applies to content-based speech

restrictions, specifically statutes, which are not at issue here. *Turner Broad. Sys., Inc.* v. FCC, 512 U.S. 622, 680 (1994). Rather, not only is the speech at issue content neutral and commercial speech, Defendant is not arguing that the D.C. CPPA is violating Defendant's First Amendment rights.[16] Defendant is arguing that Plaintiff is misapplying a valid statute. Thus, the only question to be answered is whether Plaintiff has met the elements of the D.C. CPPA, not whether enforcement of the D.C. CPPA "in the manner urged by Plaintiff" would violate Defendant's First Amendment rights.[17]

Although Plaintiff disagrees that Defendant has articulated a valid First Amendment issue, Plaintiff agrees that the Supreme Court has also afforded protection to speech on matters of public concern. However, again, Defendant misinterprets *Gertz v. Robert Welch, Inc.*, when it claims that the case law articulates protections that encompass potentially misleading speech "to provide the breathing space necessary for such speech to survive."[18] Instead, the Supreme Court's statement that "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters" was meant to convey that in a defamation suit, allowance of the defense of truth, with the burden of proving it on a defendant, does not mean that only false speech will be

---

[16] Interestingly, Defendant claims that the speech at issue here is not commercial in nature and yet argues that strict scrutiny must apply based on cases involving commercial speech like Barr v. Am. Ass'n of Political Consultants, Inc., 140 S. Ct. 2335, 2346 (2020); Int'l Outdoor, Inc. v. City of Troy, Mich., 974 F.3d 690, 707-08 (6th Cir. 2020); Sorrell v. IMS Health Inc., 564 U.S. 552, 565 (2011).

[17] Defendant's Motion to Dismiss, p. 12.

[18] Defendant's Motion to Dismiss, p. 12, 418 U.S. 323, 240 (1974). Defendant also references Time, Inc. v. Hill, 385 U.S. 374, 387 (1967) in support of the notion that even false speech is protected, in an effort to emphasize the breadth of protection the Supreme Court affords speech; thus, Defendant argues that the speech at issue here, even if misleading, should be protected. However, Defendant again misinterprets, and misuses case law given that in Time, Inc. the discussion on false statements was not with respect to the protection of false speech but was merely mentioned during a discussion on the award of damages of false statements and the requirements therein. Id. In addition, Defendant states that "'heightened scrutiny' would apply to commercial speech with a public component where challenged by a 'private attorney general' under a strict liability statute," but the page number Defendant cite to, Nike, 539 U.S. at 667, does not mention heightened scrutiny in any respect. Rather, the page number Defendant provides discusses Article III's "case or controversy" and "standing" requirements.

deterred; thus, inferring that restriction of speech can include more than just false speech, not the antithetical interpretation made by Defendant.[19]

### B. The Commercial Speech at Question Is in Fact Misleading.

Defendant rightfully states that certain categories of speech, like the commercial speech at issue here, are subject to lesser constitutional protection. As cited by Defendant's *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* for commercial speech to be afforded First Amendment protection the speech must at least concern lawful activity and not be misleading.[20] If the speech meets this criterion, the court next determines whether the asserted governmental interest is substantial. *Id.* If both are true, the court must then decide whether the regulation directly advances the governmental interest asserted and whether it is not more extensive than necessary to serve that interest. *Id.*

Here, only the first factor needs to be considered given that the commercial speech at question is in fact misleading because Defendant's statements on both its packaging and website promise, among others, "Clean Nourishment… Before & After Pregnancy."[21] As noted in the Complaint, such promises made by Defendant on its packaging are false and misleading given that Defendant's products contain quantifiable amounts of lead, cadmium, mercury, and Bisphenol A ("BPA"), and detectable amounts of pesticides.

### C. Defendant Mistakenly Relies on Caselaw That Addresses The Constitutionality of The D.C. CPPA Itself.

Defendant relies on *Zauderer v. Office of Disciplinary Counsel* in claiming that Plaintiff's Complaint, not the D.C. CPPA, "violates the First Amendment.".[22] However, yet again, Defendant

---

[19] *Id.*
[20] 447 U.S. 557, 562-64 (1980).
[21] Complaint pg. 6, Fig. 2
[22] Defendant's Motion to Dismiss, p. 16. 471 U.S. 626, 651 (1985).

is relying on case law that discusses the constitutionality of the statute itself. In *Zauderer,* the Supreme Court held that restrictions on commercial speech are met with even less scrutiny when "the government seeks to compel the disclosure of a warning or disclaimer that is (i) purely factual and uncontroversial, (ii) reasonably related to a substantial government interest, and (iii) neither unjustified nor unduly burdensome."[23] The Supreme Court stated,

> "Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides … appellant's constitutionally protected interest in not providing any particular factual information in his advertising is minimal. Thus, in virtually all our commercial speech decisions to date, we have emphasized that because disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech, '[warnings] or [disclaimers] might be appropriately required … in order to dissipate the possibility of consumer confusion or deception." *Id.*

Here, the Supreme Court held that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of a consumer. *Id.* at 672. As in *Zauderer*, if the court chooses to acknowledge Defendant's First Amendment argument, such lesser scrutiny applies here given that Defendant's claims on both its packaging and online advertising are false and misleading representations and omissions and are in violation of the District of Columbia Consumer Protection Procedures Act ("D.C. CPPA"), D.C. Code §28-3901, et seq. Thus, Defendant's insistence that strict scrutiny should apply is without merit.

**D.   The Very Purpose of Defendant's Website Is To Facilitate Sales Of The Products.**

Defendant claims that the advertising found on its packaging and website do not constitute commercial speech given that the statements made by Defendant are, in part, "made on the 'about us' page of Garden of Life's website … [and] do not reference any of the Products…" Thus,

---

[23] Defendant's Motion to Dismiss, p. 13, *citing* 471 U.S. 626, 651 (1985).

Defendant claims that the statements "do not 'propos[e] a commercial transaction,' the sin qua none of commercial speech. *Central Hudson*, 447 U.S. at 562."[24]  Defendant is again misguided and assumes that the proposition of a commercial transaction cannot be inferred. The very point and purpose of Defendant's website is to facilitate sales and promotion of its products, and Defendant's "about us" page is used to portray a certain image and mission that is meant to convince consumers to purchase their products; thus, Defendant's statements do exactly what commercial speech requires, propose a commercial transaction. Further, it would be irrational to argue that Defendant's packaging is not also proposing a commercial transaction given that the promises made are clearly executed with the intent of convincing the consumer to purchase Defendant's products over that of a competitor. Accordingly, Defendant's speech, both on its website and packaging, is commercial in nature and should be treated accordingly.

## E. Defendant's Reliance on *Int'l Outdoor, Inc. V. City Of Troy*, Mich., 974 F.3d 690 (6th Cir. 2020), Is Misplaced.

Defendant claims that "[e]ven if the challenged statements are considered commercial speech, the restrictions Plaintiff seeks to impose are still subject to strict scrutiny because they are content-based."  In support of this claim, Defendant cites *Int'l Outdoor, Inc. v. City of Troy*, Mich., 974 F.3d 690 (6th Cir. 2020); however, Defendant misapplies this case law given that *Int'l Outdoor, Inc.* involves the application of strict scrutiny when a government is attempting to restrict speech because of "its ideas, its subject matter, or its content." The Court goes on to hold that "[l]aws that target speech based on its communicative content are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* Here, Defendant is attempting to argue that strict scrutiny should apply to Plaintiff's Complaint that has been filed for the purpose of lawfully enforcing the D.C.

---

[24] Defendant's Motion to Dismiss, p. 13.

CPPA; however, Defendant's Motion to Dismiss is not arguing that the relevant law, specifically the D.C. CPPA, is targeting speech based on its communicative nature and subject to strict scrutiny. Defendant is seeming to challenge Plaintiff's attempt to enforce the D.C. CPPA; thus, *Int'l Outdoor, Inc*. would not apply to this matter given that Defendant is not challenging the constitutionality of the statute itself.

Again, Defendant misapplies case law and the application of strict scrutiny when it references *Reed v. Town of Gilbert, Ariz*., 576 U.S. 155, 163 (2015). As quoted in Defendant's Motion to Dismiss, *Reed* explains that laws that "target speech based on its communicative content … are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." As noted above, Defendant is not making a claim anywhere in its Motion to Dismiss that the D.C. CPPA is unconstitutional and/or that it targets speech based on its communicative nature. Rather, Defendant is challenging the constitutionality of the enforcement of Plaintiff's Complaint.

## F. <u>Plaintiff's Complaint Attempts to Enforce the D.C. CPPA.</u>

Plaintiff's Complaint is clearly not a law that "targets speech based on its communicative content" but is instead an attempt to enforce the D.C. CPPA. If Defendant wishes to make an argument using *Reed*, it would need to attack the constitutionality of the law, itself. Given that Defendant has not attacked the constitutionality of the D.C. CPPA, neither *Reed* nor *Int'l Outdoor, Inc*. should apply; thus, strict scrutiny does not apply. The only issue to be addressed is whether Plaintiff's Complaint satisfies the requirements set forth in the D.C. CPPA, and it does.

Defendant goes on to argue that the speech in question "is also entitled to heightened protection because it involves an issue of public concern."[25] Yet again, Defendant's use of case

---

[25] Defendant's Motion to Dismiss, p. 14, *citing* Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974).

law is misguided and misapplied. In the case of *Gertz*, the issue involved libel towards a public figure, not whether a constitutionally valid statute is being unconstitutionally enforced. Attempting to apply the case law present in *Gertz* to the case at hand is illogical given that there is virtually nothing factually similar between this case and *Gertz*, as *Gertz* addressed defamation of a public figure. As stated above, Defendant's speech falls within the exact definition of commercial speech given that it proposes a transaction.[26]

Defendant digresses when it states, "There is no governmental interest, much less a compelling one, in limiting exposure to contaminants to levels below those identified by the FDA or EPA as having no safety risk." *Id.* at 15. Plaintiff does not allege anywhere in its Complaint that Defendant should be required to limit exposure to contaminants to levels below those identified by the FDA or EPA. Such a statement is meant to confuse the Court as to the issues at question. Here, Plaintiff is seeking to call into question Defendant's deceptive labeling, marketing, and sale of the Product given the quantifiable levels of lead, cadmium, mercury and Bisphenol A ("BPA") that is in direct conflict with the promises and assurances made by Defendant on its packaging and website. Defendant again misses the mark when it argues that "there is no governmental interest – much less a substantial one – in limiting the speech of entities selling products that contain any residues of pesticides or trace elements of metals…." *Id.* Defendant is confusing the issues by inferring through this statement that Plaintiff is attempting to restrict Defendant's free speech because its Products contain "any residues of pesticides…" when, in reality, Plaintiff is attempting to enforce a constitutionally valid statute that creates legal consequences for a defendant when it is advertising and/or marketing a product a way that is not accurately representative of that product,

---

[26] Defendant also references *Nike, Inc. v. Kasky* in support of applying heightened scrutiny, but again, this case should not apply given that the discussion of heightened scrutiny was in reference to a regulation, itself. 539 U.S. 654 (2003) ("I would apply a form of heightened scrutiny to the speech regulations in question, and I believe that those regulations cannot survive that scrutiny." *Id.* at 676.)

to the detriment of the consumer. Here, Defendant is doing just that when it advertises and markets its Products as healthful prenatal vitamins when they are in fact adulterated.

Defendant also recites the court in *Lorillard Tobacco Co. v. Reilly* that states that the Central Hudson test "requires a showing that 'the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'"[27] *Lorillard Tobacco Co*., like many other cases that Defendant cites, addresses the constitutionality of a statute, not the constitutionality of a private entity allegedly attempting to restrict speech by stepping beyond the scope of or through the guise of enforcing a valid statute. Defendant conveniently omitted the first portion of the quoted sentence that demonstrates that the Central Hudson test pertains to the validity of a regulation or a statute itself when the court says that "a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 555 (2001). Thus, both *Central Hudson* and *Lorillard Tobacco Co*. do not apply given that Defendant is not questioning the constitutionality or validity of the D.C. CPPA but is merely arguing that Plaintiff is attempting stepping beyond the bounds of the statute (i.e. that Plaintiff has not met the elements set forth in the statute).

Defendant is asking the Court to rule on the constitutionality of the enforcement of a complaint rather than simply ruling on whether Plaintiff has met the elements required under the D.C. CPPA to survive Defendant's Motion to Dismiss. Defendant's First Amendment argument with respect to Plaintiff's Complaint, is asking the court to step beyond the bounds of the very case law that Defendant has provided. To ask the Court to delve into whether enforcing the D.C. CPPA in the manner urged by Plaintiff would violate Defendant's First Amendment Rights is

---

[27] Defendant's Motion to Dismiss, p. 16, 533 U.S. 525, 555 (2001).

unnecessary. If application of the statute would result in a violation of First Amendment rights, then Defendant should question the constitutionality of the statute itself. Given that the validity of the statute is not being questioned, the court merely needs to ask whether the elements of the statute are met, or not.

## V.    FEDERAL LAW DOES NOT PREEMPT THIS D.C. CPPA CLAIM

### A.    Plaintiff's Complaint is Filed Under The D.C. CPPA, Which Asks The Court To Determine Whether Defendant Has Engaged In Deceptive Labeling, Marketing and Sale of Defendant's Products.

Defendant's argument that "[t]he Court cannot apply the CPPA in this manner without establishing the level of each substance that presents a safety risk…" is incorrect given that 1) as articulated in Defendant's motion to dismiss, such levels have already been established by federal agencies and 2) Plaintiff's Complaint is not asking for reformulation but instead is focused wholly on the deceptive labeling, marketing, and sale of Garden of Life Products.[28] Whether Defendant's Products contain impermissible levels of contaminants is but one consideration in determining the degree to which Defendant has knowingly or recklessly engaged in deceptive labeling and marketing practices, and such a factor may be reviewed through the standard(s) set forth by said agencies. Again, Plaintiff's Complaint is filed under the D.C. CPPA, which asks the Court to determine whether Defendant has engaged in deceptive labeling, marketing, and sale of Defendant's Products.

Defendant goes on to highlight that pesticides, lead, cadmium, mercury, and Bisphenol A are all regulated, in one respect or another, by federal agencies.[29] Again, Plaintiff is not denying that federal agencies have implemented regulations nor is Plaintiff asking the Court to step into

---

[28] Defendant's Motion to Dismiss, p. 17, D.C. Code §28-3905(k)(1) and 28-39905(k)(2)
[29] Defendant's Motion to Dismiss, p. 18-20.

the shoes of federal agencies and determine appropriate safe harbor levels of contaminants. Further, such regulations do not conflict with Plaintiff's Complaint nor preclude the Court from deciding on the issue of whether Defendant has and continues to violate the D.C. CPPA.[30]

**B. Plaintiff's Complaint Does Not Reference Federal Regulations Because That is Not the Issue in Plaintiff's Complaint, Nor Proper for The Court to Address.**

Defendant states that the Complaint makes "no reference to the tolerances…" for such contaminants in the federal regulations.[31] However, a reference to said tolerances is entirely unnecessary and would distract from the point of the Complaint, which is not to demand reformulation of Defendant's Products based on a federal standard but to call for a determination that Defendant has engaged in deceptive labeling, marketing, and sale of Garden of Life Products. That being said, the levels of said contaminants are high enough to warrant concern that certain advertising and marketing techniques used by Defendant presently would mislead the consumer. Thus, the only issue is whether Defendant's labeling, marketing, and sale of its Products are deceptive and misleading to consumers of the Products in question, not whether the Products' contaminant levels fall at or below the standards set forth by regulatory agencies.

Defendant does not deny that the chemicals and toxicants listed in Plaintiff's Complaint are present in the Products at issue and are thus being ingested by expectant mothers. Hence, as agreed by both Plaintiff and Defendant, in the most literal sense, mothers and fetuses are being "exposed" to said chemicals, irrespective of the levels. Here, Defendant's Products are sold to a particularly vulnerable group who rely on prenatal vitamins to assist in the healthy development

---

[30] It should also be noted that one of the purposes of the federal regulations Defendant references is to determine when a warning label is required for a product. That is, federal agencies have set forth standards for 1) determining when an entity needs to acknowledge the presence of contaminants in a product and 2) when an entity may be silent on the matter. The federal regulations, contrary to Defendant's inferences, do not address when, if ever, an entity may make affirmative promises that infer there are no deleterious substances in the products, when there are. This is a clear distinction, and such a determination is left up to the Court to determine through the application of, in this matter, the D.C. CPPA.

[31] Defendant's Motion to Dismiss, p.18.

of fetuses. Thus, Defendant's advertising and marketing is particularly deceptive given that the very point of a prenatal vitamin is to ensure the safety of neurological development of a fetus and yet contains chemicals that would do just the opposite.[32]

### C. Defendant's Packaging and Website Mislead the Consumers Given the Disparity Between The Levels Of Contaminants Present In Defendant's Products And Those of its Competitors.

Rather than focus on permissible standards of levels of contaminants in products, which is not at issue here, the Court should look to the practices of Defendant's competitors. Just one example of the vast discrepancy in toxicant levels between Defendant's Products and those of its competitors is Defendant's Garden of Life Vitamin Code Raw Prenatal Product that contains 283.24 ppb of lead, which on a per-serving basis is higher than 96% of other prenatal vitamins tested.[33] Further, every one of the Products in question contain more, of at least one, of the listed chemicals in Plaintiff's Complaint than 88% of its competitors.[34] Thus, it would be more than reasonable to assert that, even if consumers of Defendant's prenatal products believed them to possess some levels of deleterious substances, they would certainly not expect such a level that is above nearly every other tested product in the prenatal vitamin category. Thus, Defendant's packaging and website, which lead the consumer to believe that, at a minimum, the quality of their Products is the same or better than other similar products, mislead the consumer given the grand disparity between the levels of contaminants present in Defendant's Products and those of its competitors. Further, it would not be a stretch to argue that Defendant's marketing, labeling, and advertising, created for the very purpose of enticing the consumer to choose its Products over those

---

[32] Defendant spends multiple pages touching on the regulations laid forth by the FDA and other regulatory agencies but fails to mention, as noted in Plaintiff's Complaint, that the Environmental Protection Agency, Food and Drug Administration, the World Health Organization, Centers for Disease Control and Prevention, the American Medical Association, and the American Academy of Pediatrics have all independently stated that there is *no* safe level of lead for children. Plaintiff's Complaint, p. 4.
[33] *Id.* at 19
[34] *See* Plaintiff's Complaint, ¶19-20.

of others, deceives the consumer to believe that the Products are even more healthful and contain even fewer deleterious substances than those of its competitors.

Defendant refers to *Total Telecomms. Servs., Inc. v. AT&T* that states that the doctrine of primary jurisdiction is "premised on a desire for uniform outcomes and on the inherent advantage in allowing an agency … to apply its expert judgement to the issues in dispute." 919 F. Supp. 472, 478 (D.D.C. 1996). Defendant misapplies both case law and the doctrine of primary jurisdiction given that Plaintiff is not asking the Court to decide on an issue that has been decided by a federal agency. Rather, Plaintiff is asking the Court to apply the D.C. CPPA in determining an issue that is not covered by a federal regulatory agency. None of the regulations referred to in Defendant's Motion to Dismiss discuss when an entity may make affirmative statements on the quality or purity of a product that is in direct conflict with the actual quality of the Products. Federal agencies have addressed when to be silent on the presence of toxicants and when to acknowledge the presence of toxicants, but Defendant has not pointed to a single rule or regulation by a federal agency that addresses when an entity may affirmatively state there are no toxicants when there are. Such an issue is covered under the D.C. CPPA in addressing misleading and deceptive marketing practices. Thus, the D.C. CPPA should apply, and primary jurisdiction does not.

**D.  The Doctrine of Primary Jurisdiction Should Not Be Applied To This Matter.**

The doctrine of primary jurisdiction is irrelevant and should not be applied given that Plaintiff's Complaint merely asks the Court to determine whether Defendant has violated a statute dealing with misleading or false advertising and marketing practices, not whether the levels of contaminants present in Defendant's Products are allowable, an issue Plaintiff acknowledges has already been determined by federal agencies.

Defendant is attempting to mislead the court into believing that 1) determining whether Defendant has violated the D.C. CPPA cannot be made without first determining what levels of the contaminants in question are allowable and 2) that Plaintiff is calling for the Court to determine novel permissible levels of contaminants. Determining permissible levels of contaminants in a given product is merely one factor among many that the Court can consider in determining the degree to which Defendant has violated the D.C. CPPA, and Plaintiff is not asking the Court to make a separate determination on the matter.

Defendant mentions four factors that Courts consider in determining whether to abstain under the doctrine of primary jurisdiction: "(1) whether the question at issue is within the conventional expertise of judges; (2) whether the question at issue lies particularly within the agency's discretion or requires the exercise of agency expertise; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made."[35] Although such consideration is irrelevant to this case, even if the four factors were applied here, the doctrine of primary jurisdiction would still not apply.

As to the first and second factor, the issue is whether Defendant's statements made on its packaging and website were misleading to consumers and in violation of the D.C. CPPA, and a determination of such is within the exact expertise of judges. Merely because a federal agency's regulation(s) may be taken as a factor in determining the question at issue doesn't mean that the issue itself falls within the expertise of an agency and not a judge. With respect to the third factor, there is virtually no danger of inconsistent rulings given that Plaintiff, contrary to Defendant's assertions, is asking the Court to apply an existing statute, the D.C. CPPA, that has set forth clear standards. Defendant states that multiple courts could "reach differing conclusions regarding the

---

[35] Defendant's Motion to Dismiss, p. 21.

same level of a given substance in a Product," but again, what level of a given substance in a Product is permissible is not a determination Plaintiff is asking the Court to determine.

Finally, the fourth factor, whether a prior application to the agency has been made, is not relevant given that Plaintiff is not asking the Court to decide an issue that can alternatively be solved through an application to a federal agency, like the EPA. Plaintiff is asking the Court to enforce D.C. CPPA, not a federal regulation. Thus, the doctrine of primary jurisdiction does not apply, and this case should continue under the discretion of this Court, applying the D.C. CPPA.

## VI.   CONCLUSION

Plaintiff has standing under both Article III of the U.S. Constitution as well as statutory standing via both as a public interest organization §28-390(k)(1)(D) and a non-profit organization § 28-3901(k)(1)(C) of the D.C. CPPA.  Plaintiff has established a causal connection between the actions of Defendant and the consumers of the District of Columbia, as Defendant is marketing a prenatal vitamin product that is plagued with multiple contaminants, to include neurotoxins, known to cause significant and tangible reproductive harm.  In doing so, Defendant has directly harmed the mission of CLP to educate and inform the consumers of the District as to data-based decisions regarding the safety of the Product as well as its true contents.

Additionally, enforcing the D.C. CPPA does not violate Defendant's First Amendment Right to Freedom of Speech as content-based speech restrictions are not at issue in this matter and the commercial speech at question is in fact significantly misleading.

Finally, the doctrine of primary jurisdiction should not be applied as Plaintiff's Complaint is filed under the D.C. CPPA, which asks the Court to determine whether Defendant has engaged in deceptive labeling, marketing and sale of Defendant's Products, and not to determine whether the Defendant is in violation of a federal regulatory standard.

**WHEREFORE**, Plaintiff Clean Label Project Foundation respectfully requests Defendant Garden of Life, LLC's Motion to Dismiss be **DENIED.**

Dated: December 14, 2020

Respectfully submitted,

Attorneys for Clean Label Project (CLP)

/s/ Travis Pittman
_____
Travis Pittman (D.C. Bar No. 1016894)
Counsel for Plaintiff
Holmes Pittman & Haraguchi, LLP
P.O. Box 380
Chester, MD 21619
Phone: (410) 482-9505
Fax: (443) 782-0362
jtpittman@hphattorneys.com

Kristen M. Ross, Esq.
Davitt, Lalley, Dey & McHale, PC
1971 Beltline Ave., Suite 106
Grand Rapids, MI 49525
Tel: (202) 750-0355
kristen.ross@dldmlaw.com

**Certificate of Service**

I hereby certify that on this 14th day of December, I served the foregoing *Plaintiff's Response In Opposition To Defendant's Motion To Dismiss* on all parties via the Court's electronic case filing system.

/s/ Travis Pittman
_____
Travis Pittman